IN THE UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF OKLAHOMA

| | | |
|---|---|---|
| KIMBERLY GRAHAM,<br>　　　　Petitioner, | ) <br> ) <br> ) <br> ) | |
| -vs- | ) <br> ) | Case No. 23-CV-0164-CVE-SH |
| 1) THE HONORABLE TRACY PRIDDY<br>And 2) TAMIKA WHITE, Warden,<br>　　　　Respondents. | ) <br> ) <br> ) <br> ) <br> ) | Relates to Doc. 8 |

**PETITIONER'S REPLY TO THE RESPONDENT'S
RESPONSE IN OPPOSITION PETITIONER'S PETITION
FOR A WRIT OF HABEAS CORPUS**

COMES NOW, the Petitioner, Kimberly Graham, through her attorney, and hereby submits this as Petitioner's Reply to the Respondent's Response in Opposition to Petitioner's Petition for a Writ of Habeas Corpus. Petitioner respectfully moves this Court to Deny Respondent's Response. [Doc. 8] This Reply is timely. In support thereof, Petitioner shows the Court:

I. **PETITIONER IS IN CUSTODY IN VIOLATION OF THE FOURTEENTH AMENDMENT AFTER A DISMISSAL OF CHARGES OCCURRED AND AFTER JEOPARDY ATTACHED.**

ARGUMENT AND AUTHORITY

It is undisputed by the parties that the Petitioner had been granted post-conviction relief on April 8, 2021, and no appeal was taken by the State. It is further agreed that issues of state law are *usually* not cognizable in an action brought under 28 U.S.C. § 2254(d); however, when the state law error results in a deprivation of a liberty interest in violation of Fourteenth Amendment rights, then this unlawful action is

cognizable in federal habeas. *See Hicks v. Oklahoma*, 447 U.S. 343 (1980). The Respondent erroneously claims this Court is bound by the OCCA's interpretation of state law, while ignoring that state law provided no relief from an unprecedented and arbitrary outcome. The Respondent's arguments are unpersuasive as discussed herein.

### A. STANDARD OF REVIEW

Title 28 U.S.C. § 2254(d) (1-2) provides the Writ of Habeas Corpus shall not be granted regarding a claim unless the adjudication of the claim in State Court: (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or (2) resulted in a decision based on an unreasonable determination of the facts in light of the evidence presented in the State Court proceeding.

"A State Court's decision is 'contrary to' [the Supreme Court's] clearly established law if it 'applies a rule that contradicts the governing law set forth in [Supreme Court cases]' or if it 'confronts a set of facts that are materially indistinguishable from a decision of [the Supreme] Court and nevertheless arrives at a result different from [this] precedent.'" *Mitchell v. Esparza*, 540 U.S. 12, 15-16 (2003) (per curiam) (*quoting Williams v. Taylor*, 529 U.S. 362, 405-06 (2000)).

Avoiding these pitfalls does not require citation of federal cases—indeed, it does not even require awareness of federal cases, so long as neither the reasoning nor the result of the state-court decision contradicts them. *Early v. Packer*, 537 U.S. 3, 8 (2002)(holding that the "state court need not recite Supreme Court names or even signal an awareness of them.") Further, a violation of state law can amount to a

deprivation of due process pursuant to *Hicks v. Oklahoma,* 447 U.S. 343, 100 S. Ct. 2227, 65 L. Ed.2d 175 (1980). "[I]n order to benefit from the rule in *Hicks,* a habeas petitioner must show that the alleged failure to apply state law was "arbitrary in the constitutional sense" and "shocks the judicial conscience." *Aycox v. Lytle,* 196 F.3d 1174, 1180 (10th Cir.1999). More specifically, the deprivation of liberty must be sufficiently "arbitrary" that it offends "notions of fairness" embodied in the Due Process Clause." *Harrah Independent School v. Martin,* 440 U.S. 198 (1979).

### B. CLEARLY ESTABLISHED LAW MANDATES THAT JEOPARDY HAD ALREADY ATTACHED TO PETITIONER'S PREVIOUS JUDGMENT AND AFTER THE DISMISSAL, THE CONVICTION COULD NOT BE REINSTATED.

Reinstating the Petitioner's conviction months after the un-appealed order dismissing her case was granted violated the Petitioner's constitutional right against twice being placed in jeopardy for the same offense.

"The ban on double jeopardy has its roots deep in the history of occidental jurisprudence. Fear and abhorrence of governmental power to try people twice for the same conduct is one of the oldest ideas found in western civilization.'" *North Carolina v. Pearce*, 395 U.S. 711, 733 (1969). (Citation omitted). Moreover, the "reconviction" of the Petitioner is barred by the doctrine of collateral estoppel in light of *Ashe v. Swenson*, 397 U.S. 436 (1970). The ultimate question decided in *Ashe* was that the federal rule of collateral estoppel was embodied in the Fifth Amendment guaranty against double jeopardy which is binding on the states by virtue of *Benton v. Maryland*, 395 U.S. 784, 794-795 (1969), and entitled to retroactive application. *Pearce*, 395 U.S. at 733. In *Ashe*, 397 U.S. at 442, the Court stated:

> collateral estoppel is an awkward phrase, but it stands for an extremely important principle in our adversary system of justice. It means simply that when an issue of ultimate fact has once been determined by a valid and final judgment, that issue cannot again be litigated between the same parties in any future lawsuit.

Judge Priddy's order dismissing the Petitioner's case was a final judgement and came only after jeopardy had attached. Had the State taken the proper measures, perhaps it could have maintained Petitioner's custody. The State did not take such measures. Rather the Respondents merely "reconvicted" the Petitioner by fiat and, in allowing such, the OCCA mis-stated undisputed facts in the record such as claiming "reconviction" was necessary because the Petitioner could not otherwise be prosecuted-when it is clear she was being prosecuted by the Creek Nation[1]-and claiming the Petitioner's release was unauthorized by law when it was exactly authorized the day in question. Finally, although it claimed otherwise, OCCA then retroactively applied a new principle-a principle diametrically opposed to the valid law releasing the Petitioner-and wrongly claimed it was the law all long. In sum, the Respondents disregarded the Rule of Law to achieve their desired goal. This end-justifies-the-means thinking is the very definition of arbitrary. Such a rationalization by the court of last resort in criminal cases in Oklahoma is shocking to those expecting the application of fairness.

---

[1] This fact was placed in Judge Priddy's order reconvicting the Petitioner who is still on a $52,000.00 cash bond in the Nation. *See* Doc 1-1, pg 57 and attached Ex. A. Further, the Nation's prosecution survived the Petitioner's motion to dismiss because of the statute of limitations. The Petitioner submits that OCCA's disregard of these inconvenient facts are representative of its distain for any "justice" other than its own.

Hence, the Petitioner has pleaded a Fourteenth Amendment violation relying on *Hicks*, and no matter how the claim is construed, Petitioner's re-imprisonment without holding appellate jurisdiction violated the United States Constitution and treaty rights. When a state obtains a conviction in violation of the Federal Constitution, it is always a serious wrong, not only to a particular citizen, but to Federal law. *Brown v. Allen*, 344 U.S. 443, 544 (1953). Respondent recognizes that "Petitioner also claims that the OCCA's decision is incorrect because, "having relinquished custody of the Petitioner by vacating her conviction, the State no longer has jurisdiction of her because she is Native. *See McGirt v. Oklahoma,* 140 S. Ct. 2452, 207 L. Ed. 2d 985 (2020)." [Doc. # 8 at 12]

### C. THE STATE COURT PROCEDURAL DETERMINATION IN *MATLOFF v. WALLACE* IS NOT INDEPENDENT AND ADEQUATE AND THUS RELYING ON STATE LAW IS IN CLEAR VIOLATION OF CLEARLY ESTABLISHED SUPREME COURT PRECEDENCE.

The OCCA created an invalid state procedural bar in *State ex rel, Matloff v. Wallace*, 2021 OK CR 21, ¶ 40, 497 P.3d 686, holding for the first time in "exercising our independent state law authority to interpret the remedial scope of the state post-conviction statutes, we now hold that *McGirt* and our post-*McGirt* decisions recognizing these reservations shall not apply retroactively to void a conviction that was final when *McGirt* was decided. Any statements, holdings, or suggestions to the contrary in our previous cases are hereby overruled." *Matloff,* at ¶ 15. In the case at bar, the District Court's decision to dismiss Petitioner's case was based upon clearly established law as it was before the *Matloff* decision and thus Respondent is bound by her ruling dismissing this action.

Yet, this supposed state procedural bar is not an independent and adequate state court procedural rule because it cannot support the judgment. See *Cruz v. Arizona,* 598 U.S. 143 S. Ct. 650, 214 L. Ed.2d 391 No. 21-846, at *1 (Feb. 22, 2023)(holding "where a state-court judgment rests on such a novel and unforeseeable interpretation of a state-court procedural rule that the decision is not adequate to foreclose review of the federal claim.")(Citing *Coleman v. Thompson*, 501 U.S. 722, 729 (1991)). The Federal courts have recognized that when "the state-law prong of the court's holding is not independent of federal law," its "jurisdiction is not precluded." *Ake v. Oklahoma*, 470 U.S. 68, 75 (1985); see also *Three Affiliated Tribes of Fort Berthold reservation v. Wold Engineering, P.C.*, 467 U.S. 138, 152 (1984). And the Court has not allowed states to insulate the adjudication of federal claims from review by labeling a merits determination as a procedural bar. *See, e.g., Foster v. Chatman*, 578 U.S. 488, 498–99 (2016). This Court's determination in *Matloff*, could not rest on an independent and adequate procedural bar because it has never been even-handedly applied. One rule for the State and another for the Citizen. Further, in another conscience-shocker, *Matloff* was void *ab initio* or void on its face because the State procedurally defaulted, just like the case at bar. Hence, OCCA lacked jurisdiction—but vested itself with jurisdiction anyway—because the State did not appeal the granting of post-conviction relief. Filing the notice of post-conviction appeal with the trial court clerk is jurisdictional and failure to timely file is a waiver of the right to appeal. See *Pershall v. State,* 2017 OK CR 13, 400 P.3d 871. In *Matloff,* the State violated procedural due process and the Court did just like Judge Lumpkin was

less concerned about the emperor being naked as described in *Bosse v. State,* Opinion filed: March 11, 2021, (J. Lumpkin, concurring, ¶ 3, attached Ex. B.) to the emperor has a fig leaf in *State ex rel. Matloff v. Wallace*, 2021 OK CR 21, 497 P.3d 686, 695, n. 1(wherein Judge Lumpkin acknowledges that *Matloff* is void, but believes it to be for a greater good)(J. Lumpkin, concurring).

    Here, the State sought a writ of prohibition before Judge Priddy's ruling-which was denied-thus further depriving the Court of jurisdiction. The District Court lacked jurisdiction to vacate its previous Order granting relief and again the State was forever barred by the Fourteenth Amendment.

**D.   CONGRESSIONAL ACTS UNEQUIVOCALLY IMPLICATE AND PRESENT SUCH FEDERAL PREEMPTIONS AS CONTEMPLATED IN *OKLAHOMA V. CASTRO-HUERTA.*, 597 U.S. \_\_, 142 S.Ct. 2486, 213 L.Ed.2d 847 (2022)**

Further, Petitioner argues issues of federal preemption because as Judge Rowland stated in [Doc. 1-2 at 75], he did not believe State jurisdiction is preempted when it appears that the applicable federal statute of limitations has expired. *Id.* Judge Rowland's words are nonsensical because when there is a preemption to state authority then the Respondent would lack sovereign authority. The treaty provisions that govern this area are clear: the State could not exercise sovereign authority when there was a federal preemption. In 1856, the Creeks agreed to cede to the Seminole Tribe a portion of their lands. *See* Treaty, Aug. 7, 1856, United States—Creek and Seminole Tribes, 11 Stat. 699. As for the lands still held by the Creek Nation, the United States guaranteed the "same title and tenure" as promised and secured under the 1832 and 1833 treaties. *Id.,* art. 3, 11 Stat. at 700. The 1856 Treaty reaffirmed that "no State or Territory shall ever pass laws for the Government of the Creek or Seminole tribes of

Indians," and the United States pledged that "no portion of either of the tracts of country defined in [the treaty] shall ever be embraced or included within, or annexed to, any Territory or State." *Id.*, art. 4, 11 Stat. at 700, *available* at 1856 WL 11367. *See Indian Country, U.S.A.,* at 971; *McGirt,* at 2457. Article 4 also provides "nor shall either, or any part of either, ever be erected into a territory without the full and free consent of the legislative authority of the tribe owning the same." *U.S. v. Hayes,* 20 F.2d 873, 878 (8th Cir. 1927).

Treaties between the federal government and American Indian tribes set out the duties and responsibilities that the federal government owes to a particular tribe. Treaties can cover issues such as land boundaries, hunting and fishing rights, and guarantees of peace. Hundreds of treaties were entered into between tribes and the United States between 1778 and 1871. Consistent with art. II, sec. 2, cl. 2 of the United States Constitution, these treaties were made between the tribes and the executive branch, with the advice and consent of the Senate. In 1871, Congress added a rider to the Indian Appropriations Act to end the United States' recognizing additional Indian tribes or nations, and prohibiting additional treaties which provided:

> That hereafter no Indian nation or tribe within the territory of the United States shall be acknowledged or recognized as an independent nation, tribe, or power with whom the United States may contract by treaty: Provided, further, that nothing herein contained shall be construed to invalidate or impair the obligation of any treaty heretofore lawfully made and ratified with any such Indian nation or tribe.

The Indian Appropriations Act of 1871 was clear that the treaty obligations could not be invalidated or impaired. Many years later, in 1934, Congress passed the Indian Reorganization Act, codified as 25 U.S.C. §§ 5101, *et. seq.*; 25 U.S.C. § 5128, which provides "All laws, general and special, and all treaty provisions affecting any Indian

reservation which has voted or may vote to exclude itself from the application of the Act of June 18, 1934 (48 Stat. 984) [25 U.S.C. § 5101 et seq.], shall be deemed to have been continuously effective as to such reservation, notwithstanding the passage of said Act of June 18, 1934. **Nothing in the Act of June 18, 1934, shall be construed to abrogate or impair any rights guaranteed under any existing treaty with any Indian tribe, where such tribe voted not to exclude itself from the application of said Act**." (June 15, 1935, ch. 260, §4, 49 Stat. 378) (emphasis added).[2] Thereafter in 1988, Congress enacted Public Law 100–647, thereby amending 25 U.S.C. § 71 (R.S. § 2079; Pub. L. 100–647, title III, § 3042, Nov. 10, 1988, 102 Stat. 3641), which provides, "[N]o obligation of any treaty lawfully made and ratified with any such Indian nation or tribe prior to March 3, 1871, shall be hereby invalidated or impaired."[3] Congressional intent is clearly expressed by language of the Treaties. The

---

[2] The 1934 Indian Reorganization Act ("IRA") officially ended the allotment era for all tribes. Act of June 18, 1934, ch. 576, 48 Stat. 984 (codified at 25 U.S.C. §§ 5101, etc. seq.). The IRA excluded Oklahoma tribes from applicability of five IRA sections, 25 U.S.C. § 5118, but all other IRA sections applied to Oklahoma tribes, including provisions ending allotment.

[3] *Cf. Antoine v. Washington*, 420 U.S. 194, 95 S.Ct. 944, 43 L.Ed.2d 129 (1975), "The Act of Mar. 3, 1871, 16 Stat. 544, 566, now codified as 25 U.S.C. § 71, provides: 'No Indian nation or tribe within the territory of the United States shall be acknowledged or recognized as an independent nation, tribe, or power with whom the United States may contract by treaty; but no obligation of any treaty lawfully made and ratified with any such Indian nation or tribe prior to March 3, 1871, shall be invalidated or impaired.'" *Id.*, at 202, n. 8. In 1988, Congress passed "The Technical and Miscellaneous Revenue Act of 1988 (Public Law 100-647)," which amended 25 U.S.C. § 71. As amended, the full text of 25 U.S.C. § 71, reads as follows: "No Indian nation or tribe within the territory of the United States shall be acknowledged or recognized as an independent nation, tribe, or power with whom the United States may contract by treaty; **but no obligation of any treaty lawfully made and ratified with any such Indian nation or tribe prior to March 3, 1871, shall be hereby invalidated or impaired.** Such treaties, and any Executive orders and Acts of Congress under which the rights of any Indian tribe to fish are secured, shall be construed to prohibit (in addition to any other prohibition) the imposition under any law of a State or political subdivision thereof of any tax on any income derived from the exercise of rights to fish secured by such treaty, Executive order, or Act of Congress if section 7873 of Title 26 does not permit a

State of Oklahoma could never have acquired sovereign authority over the lands within any of the Five Civilized Tribes, thus there is a clear federal preemption as expected by *Oklahoma v. Castro-Huerta*, and no analysis which ignores the treaty obligations follows the constitutional mandate that treaties are Supreme law of the land

In *Herrera v. Wyoming*, 587 U.S. __, 139 S. Ct. 1686, 203 L. Ed.2d 846 (2019) the Court dealt with Wyoming's Statehood Act, and whether it abrogated Treaty provisions:

> We first consider whether the Crow Tribe's hunting rights under the 1868 Treaty remain valid. Relying on this Court's decision in *Mille Lacs*, Herrera and the United States contend that those rights did not expire when Wyoming became a State in 1890. We agree…. First, the Wyoming Statehood Act does not show that Congress intended to end the 1868 Treaty hunting right. **If Congress seeks to abrogate treaty rights, "it must clearly express its intent to do so."** *Mille Lacs*, 526 U.S. at 202, 119 S. Ct. 1187. **"There must be 'clear evidence that Congress actually considered the conflict between its intended action on the one hand and Indian treaty rights on the other, and chose to resolve that conflict by abrogating the treaty.'"** *Id.*, at 202-203, 119 S. Ct. 1187 (*quoting Dion*, 476 U.S. at 740, 106 S.Ct. 2216); *see Menominee Tribe*, 391 U.S. at 412, 88 S.Ct. 1705. Like the Act discussed in *Mille Lacs*, the Wyoming Statehood Act "makes no mention of Indian treaty rights" and "provides no clue that Congress considered the reserved rights of the [Crow Tribe] and decided to abrogate those rights when it passed the Act." Cf. *Mille Lacs*, 526 U.S. at 203, 119 S.Ct. 1187; see Wyoming Statehood Act, 26 Stat. 222. There simply is no evidence that Congress intended to abrogate the 1868 Treaty right through the Wyoming Statehood Act, much less the "'clear evidence'" this Court's precedent requires. Mille Lacs, 526 U.S. at 203.

Next, more recently in *Lac Courte Oreilles Band of Lake Superior Chippewa Indians of Wisconsin v. Evers*, 46 F.4th 552 (7th Cir. 2022), the Seventh Circuit undertook an analysis of 25 U.S.C. § 71, as it pertains to Treaty obligations:

---

like Federal tax to be imposed on such income." (Emphasis added).

> But even as Congress in 1871 carved a bigger role for itself going forward, it took care to emphasize that existing Indian treaties retained full effect—at least until further notice. See 25 U.S.C. § 71 (providing that "no obligation of any treaty lawfully made and ratified with any such Indian nation or tribe prior to March 3, 1871, shall be hereby invalidated or impaired"). Unless Congress expressly says otherwise, then, an Indian treaty remains the "supreme Law of the Land." *McGirt*, 140 S.Ct., at 2462 (quoting U.S. Const. art. VI, cl. 2…. **To this point, we have said little about the document that created and that lies in the background of this case—the Treaty of La Pointe. Everyone agrees that, since Congress has never said otherwise, that Treaty remains the "supreme Law of the Land."** ***McGirt*, 140 S.Ct., at 2462 (quoting U.S. Const. art. VI, cl. 2); see also 25 U.S.C. § 71 (affirming the continued validity of "any treaty lawfully made and ratified with any … Indian nation or tribe prior to March 3, 1871**"). And a close look at the specific promises contained in the 1854 Treaty leaves us especially loathe to recognize the surrender-of-tax-immunity theory advocated by the State…. Had Congress enacted the text of the 1854 Treaty in the form of a statute, all the lands in question would be fully taxable under the reasoning of *Yakima*. In this sense the distinction the Supreme Court's cases have drawn here—between congressionally authorized alienability (which renders lands taxable) and alienation in fact (which does not)—might seem needlessly formalistic and leading to an odd practical result…. The State of Wisconsin and its localities seek to tax Ojibwe tribal members who own Ojibwe reservation lands. We hold that they may not do so.

*Id.*, at 557, 569, and 571 (emphasis added).

### i. Federal lawsuit filed in the Western District of Oklahoma finding a federal preemption.

Oklahoma filed a Federal lawsuit asking for an injunction attacking the Government's decision to strip Oklahoma of its regulatory authority over surface mining on the Creek Reservation in *Oklahoma v. U.S. Department of Interior, et. al.*, Case No. CIV-21-719-F. The Court faced an interpretation and application of a federal statute, the *Surface Mining Control and Reclamation Act,* 30 U.S.C. §§ 1201 *et seq*. (SMCRA). For decades, Oklahoma has regulated surface coal mining and reclamation operations within its borders, including on land previously understood–for more than a hundred years–to lie within the

former boundaries of disestablished Indian reservations. That understanding was upended when the Supreme Court ruled that the Creek Reservation in eastern Oklahoma had never been disestablished. *McGirt*. On November 9, 2022, United States District Judge declared, pursuant to the Declaratory Judgment Act, 28 U.S.C. § 2201, that:

> The Surface Mining Control and Reclamation Act, 30 U.S.C. §§ 1201, *et seq.*, <u>preempts application</u> of Oklahoma state laws regulating surface coal mining and reclamation activities within the exterior boundaries of the Creek Reservation; and
>
> The Surface Mining Control and Reclamation Act and its implementing regulations designate the Office of Surface Mining Reclamation and Enforcement as the exclusive regulatory authority over surface coal mining and reclamation activities within the exterior boundaries of the Creek Reservation in the absence of an approved tribal regulatory program.
> Doc. # 107

The preemptive effect of a federal law "may be either expressed or implied, and 'is compelled whether Congress's command is explicitly stated in the statute's language or implicitly contained in its structure and purpose.'" *Gade v. Nat'l Solid Wastes Mgmt. Ass'n*, 505 U.S. 88, 98 (1992) (citation omitted).

When we look at the language used by Congress in Oklahoma's Enabling Act Oklahoma has **no** "interest," because that language was clear "[t]hat the people inhabiting said proposed State do agree and declare that they forever disclaim all right and title, in or to any unappropriated public lands lying within the boundaries thereof, and to all lands lying within said limits owned or held by any Indian, tribe, or nation; and that until the title to any such public land shall have been extinguished by the United States, the same shall be and remain subject to the jurisdiction, disposal, and control of the United States…." *Id.*, § 3 at Third, 34 Stat., 270 (emphasis added) *See* Okla. Const. art. I § 3. *See In re Initiative*

*Petition No.* 363, 1996 OK 122, 927 P.2d 558, 563 & n. 12. In re Initiative Petition No. 363, 1996 OK 122, 927 P.2d 558, 563 & n. 12.  .

### ii. Oklahoma cannot assert Sovereign Authority as Congressional intent is clear considering Oklahoma's own interpretation of Federal law.

Oklahoma Supreme Court's interpretation of its Enabling Act in *Higgins v. Brown*, 1908 OK 28, ¶ 164, 94 P. 703, one of the most extensive analysis—one year after statehood—found, "[b]y the same process of reasoning followed by the Court in cases of *U.S. v. McBratney,* 104 U.S. 621 (1882), and *Draper v. U.S.*, 164 U.S. 240 (1896), we conclude that the Congress, upon the admission of Oklahoma as a State, where it has intended to except out of such state an Indian reservation, or **the sole and exclusive jurisdiction over that reservation, it has done so by express words.**" *Id.* Oklahoma's interpretation supports Petitioner's claims of federal preemption. However, Oklahoma's view over the years has only been to vest itself with a right preempted by federal law. Oklahoma, like many other states, had to disclaim jurisdiction over Indians at statehood. See Enabling Act, ch. 3335, § 3, 34 Stat. 267, 270 (1906);  Enabling Act Amendment, ch. 2911, 34 Stat. 1286 (1907) .

### iii. The United States Supreme Court's interpretation of Oklahoma's Enabling Act.

The State attempted to construe the Oklahoma Enabling Act and interpreting it as a general reservation of federal and tribal jurisdiction over Indians and their lands and property. *Indian Country, U.S.A. v. Oklahoma Tax Com'n*, 829 F.2d 967 (10th Cir. 1987) *cert. denied,* 487 U.S. 1218 (1988). The Court rejected Oklahoma's position that its disclaimer was solely governmental, stating Oklahoma's disclaimer is one both of

proprietary and of governmental authority[4]. *See Id.*, at 976-81. Neither the Oklahoma Supreme Court, nor the State in *Seneca-Cayuga Tribe v. State ex rel. Thompson*, 874 F.2d 709 (10th Cir. 1989) agreed with the Tenth Circuit's conclusion.

### iv. Primacy of Federal Interest

The Constitution afforded Congress authority to make war and negotiate treaties with the Tribes. See Art. I, § 8; Art. VI, cl. 2. It barred States from doing either of these things. *See* Art. I, § 10. And the Constitution granted Congress the power to "regulate Commerce ... with the Indian Tribes." Art. I, § 8, cl. 3. Nor did the Constitution replicate the Articles' carveout for state power over Tribes within their borders. Madison praised this change, contending that the new federal government would be "very properly unfettered" from this prior "limitatio[n]." The Federalist No. 42, at 268. Antifederalist Abraham Yates agreed (but bemoaned) that the Constitution "totally surrender[ed] into the hands of Congress the management and regulation of the Indian affairs." Letter to the Citizens of the State of New York (June 13-14, 1788), in 20 Documentary History of the Ratification of the Constitution 1153, 1158 (J. Kaminski et al. eds. 2004).

---

[4] Oklahoma Supreme Court has held in recent years that the Oklahoma disclaimer is one of proprietary, but not of governmental, authority. *See Currey v. Corporation Comm'n*, 1979 OK 89, 617 P.2d 177, 179-80, *cert. denied*, 452 U.S. 938 (1981)*Currey v. Corporation Comm'n*, 1979 OK 89, 617 P.2d 177, 179-80, *cert. denied*, 452 U.S. 938 (1981)" \s "Currey v. Corporation Comm'n, 1979 OK 89, 617 P.2d 177, 179-80, cert. denied, 452 U.S. 938 (1981)" \c 1  (disclaimer is one of proprietary interest in Indian lands), *see also Organized Village of Kake v. Egan*, 369 U.S. 60, 69 (1961)*Organized Village of Kake v. Egan*, 369 U.S. 60, 69, 82 S.Ct. 562, 7 L.Ed.2d 573  (1961)" \s "Organized Village of Kake v. Egan, 369 U.S. 60, 69, 82 S.Ct. 562, 7 L.Ed.2d 573  (1961)" \c 1 (construing Alaskan disclaimer as proprietary rather than governmental). The reasoning behind *Organized Village of Kake* was that Alaska was a public law 280 state. The Tenth Circuit held the Enabling Acts conferring statehood in Oklahoma are federal enactments. *Seneca-Cayuga Tribe v. State ex rel. Thompson*, 874 F.2d 709 (10th Cir. 1989)

### v. Oklahoma's Administrative Surface Mining Control and Reclamation is preempted by Federal law and Oklahoma Administrative Code.

Oklahoma is a primacy state that has an approved Title V state regulatory program. 47 Fed. Reg. 14,152 (April 2, 1982). Under the approved program, Oklahoma may monitor "coal exploration and surface coal mining and reclamation operations on non-Indian and non-Federal lands within Oklahoma." *Id.; see also* Okla. Admin. Code 460:20-3-5 (defining Oklahoma's "state program" to include "non-Indian and non-Federal lands within that State").

### vi. Medical Marijuana Licenses are preempted by Federal law and Oklahoma Administrative Code.

Next, even Oklahoma's medical marijuana licenses cannot apply within any land held by the Indians, or any land held in trust by the United States. See Okla. Admin. Code 310:681-1-3 which states: "All medical marijuana licenses and rights granted under Oklahoma law and this Chapter shall only be valid in the State of Oklahoma, excluding any tribal trust or tribal restricted land or federal lands in the state…"

### vii. Oklahoma Tax Commission's rules preempt authority to impose taxes in Indian Country because that is derived from Federal Law and Oklahoma Administrative Code.

Okla. Admin. Code 710:50-15-2 a) Definitions. These words and terms, when used in this Section, shall have the following meaning, unless the context clearly indicates otherwise: (1) "Indian Country" means and includes formal and informal reservations, dependent Indian communities, and Indian allotments, the Indian titles to which have not been extinguished, whether restricted or held in trust by the United States. [See: 18 U.S.C.

§ 1151] (2) "Informal reservations" means and includes lands held in trust for a tribe by the United States and those parts of a tribe's original reservation which were neither allotted to individual Indians. Without explicit congressional direction to the contrary, the Supreme Court presumes against a State having the jurisdiction to tax within Indian Country, whether the particular territory consists of a formal or informal reservation, allotted lands, or dependent Indian communities. *Oklahoma Tax Comm'n v. Sac and Fox Nation*, 508 U.S. 114, 128, 113 S. Ct. 1985, 124 L. Ed.2d 30 (1993) .

In *Video Gaming Techs., Inc. v. Rogers Cnty. Bd. of Tax Roll Corr.*, 2019 OK 83, 475 P.3d 824, 834, the Oklahoma Supreme Court held that the "ad valorem taxation of gaming equipment here is preempted", *cert. denied*, *Rogers Cnty. Bd. of Tax Roll Corr. v. Video Gaming Techs.*, 592 U.S. ___, 141 S. Ct. 24 (2020)(Justice THOMAS, dissenting from the denial of certiorari). In the dissent he recognizes the *McGirt* decision "profoundly destabilized the governance of eastern Oklahoma" and "create[d] significant uncertainty" about basic government functions like "taxation." *Id.* at 24. [A]bsent cession of jurisdiction or other federal statutes permitting it ... "a State is without power to tax reservation lands and reservation Indians." *County of Yakima v. Confederated Tribes and Bands of Yakima Nation*, 502 U.S. 251, 258 (1992) (*quoting Mescalero Apache Tribe v. Jones*, 411 U.S. 145, 148 (1973)(emphasis added, other alteration in original). Further, Oklahoma's position that the Supreme Court's decision in *City of Sherrill, N.Y. v. Oneida Indian Nation of New York*, 544 U.S. 197 (2005) supported its position in *Oklahoma v. U.S. Department of Interior, et al.*, WD OK CIV-21-719-F. 2021-12-22, was rejected by finding that *Sherrill* did not compel a different result.

### viii. *Oklahoma v. Castro-Huerta,* 142 S. Ct. 2486 (2022) *Does Not Vest Oklahoma With Authority When There is a Federal Preemption.*

Next, turning to what the Supreme Court held in *Castro-Huerta,* finding that [u]nder Court precedent, a State's jurisdiction in Indian Country may be preempted by Federal law under ordinary principles of federal preemption, or when the exercise of state jurisdiction would unlawfully infringe on tribal self-government. *Castro-Huerta*, 142 S. Ct at 2489. The Petitioner maintains there is clearly a federal preemption but also maintains that unlawful state action infringes on tribal self-governance. In *Castro-Huerta*, the Court employed the "*Bracker*[1] balancing test" which recognized that even when federal law does not preempt state jurisdiction under ordinary preemption analysis, preemption may still occur if exercising state jurisdiction would unlawfully infringe upon tribal self-government. See *Bracker*, 448 U.S. at 142-143; *see also New Mexico v. Mescalero Apache Tribe*, 462 U.S. 324, 333-335 (1983).  Under the *Bracker* test, the Court considers tribal interests, federal interests, and state interests. *Bracker*, 448 U.S., at 145.  Here, there could be no valid state interest because the reservation land was never to be part of a state or territory.

Oklahoma is different because Congress was explicit that Oklahoma had to disclaim jurisdiction under Oklahoma's Enabling Act which provided "no repeal, express or implied," of treaty provisions. *Ex parte Webb*, 225 U.S. 663, 682 (1912).  In prefacing the seriousness and scope of the State's lack of sovereign authority, in the case of *Ware v. Hylton*, 3 U.S. 199  (1796), the Court was bound to strike down an invalid Virginia law as violating a treaty provision that the "Supremacy Clause" (U.S. Const., art. VI, cl. 2) made superior, whereby:

---

[1] *White Mountain Apache Tribe v. Bracker*, 448 U.S. 136 (1980).

> If doubts could exist before the establishment of the present national government, they must be entirely removed by the 6th article of the Constitution, which provides "That all treaties made, or which shall be made, under the authority of the United States, shall be the Supreme law of the land; and the Judges in every State shall be bound thereby, anything in the Constitution, or laws, of any State to the contrary notwithstanding." There can be no limitation on the power of the people of the United States. By their authority the State Constitutions were made, and by their authority the Constitution of the United States was established; and they had the power to change or abolish the State Constitutions, or to make them yield to the general government, and to treaties made by then authority. **A treaty cannot be the Supreme law of the land, that is of all the United States, if any act of a State Legislature can stand in its way. If the Constitution of a State (which is the fundamental law of the State, and paramount to its Legislature) must give way to a treaty, and fall before it; can it be questioned, whether the less power, an act of the State Legislature, must not be prostrate? It is the declared will of the people of the United States that every treaty made, by the authority of the United States, shall be superior to the Constitution and laws of any individual State; and their will alone is to decide.** — If a law of a State, contrary to a treaty, is not void, but voidable only by a repeal, or nullification by a State Legislature, this certain consequence follows, that the will of a small part of the United States may control[sic] or defeat the will of the whole. **The people of America have been pleased to declare, that all treaties made before the establishment** of the National Constitution, **or laws of any of the States, contrary to a treaty, shall be disregarded.**

*Id.,* at 236-237 (emphasis added).

At no point in *Castro-Huerta* were the Treaties considered, nor 25 U.S.C. § 71, with the Oklahoma Enabling Act. The Petitioner states that had the treaty provisions been considered, it would have presented an issue that clearly established a federal preemption. In *Bracker*, the Court held that even when federal law does not preempt state jurisdiction under ordinary preemption analysis, preemption may still occur if the exercise of state jurisdiction would unlawfully infringe upon tribal self-government. *Id* at. 142-143. The statutes enacted for Oklahoma do not extend to Indian Country because only the legislative body of the tribes may regulate its own land when state authority is preempted.

## CONCLUSION

The Respondents and OCCA forgot we are a nation of laws, rather than apparatchiks serving the political winds. Ms. Graham, who surrendered the morning after the event and surrendered in this matter respectfully asks this Court to reverse this miscarriage of justice.

WHEREFORE, the Petitioner respectfully prays this Court will issue an Order Unconditionally Granting the Writ or any such other relief at law or equity the Court deems just and proper.

Respectfully submitted to the Court and delivered to:

Jennifer L. Crabb, Oba# 20546
Assistant Attorney General
313 N.E. 21st Street
Oklahoma City, Oklahoma 73105
Service email: fhc.docket@oag.state.ok.us

As of May 16, 2023, by

/s/ Richard O'Carroll
T. Richard O'Carroll, OBA # 11947
***O'Carroll & O'Carroll***
2171 N. Vancouver
Tulsa, OK 74127
918-581-2464
troc@cox.net

**ATTORNEY FOR KIMBERLY GRAHAM**